## BOSTON AND PROVIDENCE RAILROAD CORPORATION *vs.* MIDLANE RAILROAD COMPANY & others.

By Rev. Sts. *c.* 39, § 73, a railroad corporation, who file the location of their road with the county commissioners within one year, as required by § 75, may, after the expiration of that year, within the time prescribed by law for completing their road, vary the location of any portion of their road to any extent, provided they do not locate any part thereof without the limits prescribed by their act of incorporation; although their act of incor poration, which provides that they shall have the powers and duties set forth in Rev. Sts. *c.* 39, also provides that it shall be void, if their location be not filed within one year. And their power so to vary their location is not controlled or limited by the original location, as filed with the county commissioners.

A plan exhibited to the legislature by those applying for an act of incorporation as a rail road company, but not referred to in the act, is not admissible in evidence to control the construction of the provisions of the act of incorporation, as to the limits within which the road is to be located.

Boston and Providence Railroad Corporation *v.* Midland Railroad Company & others.

By *St.* 1850, c. 268, the Midland Railroad Company were authorized to locate and construct a railroad, " commencing at some convenient point on the Norfolk County Railroad; thence through the southerly part of Dedham; thence through or near the westerly part of the towns of Canton and Milton." *Held,* that a location, commencing at a point on the Norfolk County Railroad in South Dedham, and not departing from that road at once, but running northerly upon it for more than two miles, and then approaching within two hundred rods of the northwesterly corner of Canton, and running near the westerly boundary of Milton, was authorized by the statute.

A corporation, who have been authorized to construct a railroad, and are afterwards authorized by statute to make it in sections of five miles each, provided that they shall not commence the construction of any portion of their road within a certain distance of one of its terminations, until all the stock is subscribed for by responsible persons, and a certain portion thereof actually paid in, are not obliged to have their stock subscribed for, and the specified amount paid in, as a condition precedent to constructing their whole road not in sections.

Whether a private right or interest, injured or put in hazard, by the exercise, by any private corporation, of a franchise or privilege not conferred by law, must be a right or interest, for an injury to which some remedy previously existed in law or equity, in order to authorize an application to this court under St. 1852, c. 312, § 42, for leave to file an information in the nature of a *quo warranto — quære.*

PETITION under *St.* 1852, *c.* 312, § 42, presented on the 8th of May 1854, for leave to file the following information:

" Be it remembered that the Boston and Providence Railroad Corporation, established as such by the laws of the Commonwealth of Massachusetts, by Charles H. Warren, their president, in this behalf duly authorized, come in the supreme judicial court in the county of Suffolk, commonwealth aforesaid, and give the court to understand and be informed, that the said Boston and Providence Railroad Corporation, by an act passed the 22d of June 1831, chapter 56, and by sundry acts in addition thereto, were authorized to locate, construct and maintain a railroad, beginning at or near the city of Boston, and thence to the line of the Commonwealth in Pawtucket or Seekonk, in the direction of Providence, in the state of Rhode Island: That after the said first named act, and in pursuance of the authority thereby conferred, they constructed the said railroad, at great cost and expense, and are now in possession and in the enjoyment thereof, and of the land over which their said road has been constructed, and of all and singular the easements, liberties, privileges and appurtenances, thereto by law secured and belonging.

342          SUFFOLK AND NANTUCKET.

Boston and Providence Railroad Corporation *v.* Midland Railroad Company & others.

" And the said Boston and Providence Railroad Corporation further inform, that on the 2d of May 1850, an act was passed by the commonwealth aforesaid, wherein and whereby Marshall P. Wilder, Robert Codman, Welcome Farnum and H. K. Horton, their associates and successors, upon sundry terms, limitations and conditions, were made a body corporate by the name of the Midland Railroad Company, with authority to locate, construct and maintain a railroad, commencing at some convenient point on the Norfolk County Railroad in South Dedham, thence through the southerly part of Dedham; thence through or near the westerly part of the towns of Canton and Milton, to the town of Dorchester; thence in a northerly direction, through the town of Dorchester, passing through or near the easterly part of the city of Roxbury, and across the bay and marsh to South Boston; and through South Boston, southeasterly of A Street, at such place and in such manner as should be satisfactory to the mayor and aldermen of the city of Boston; and over the flats, within the line of one hundred rods from high water mark, to a point on Broad Street, or Sea Street, between the northerly side of French's Wharf and the southerly line of Amory's Wharf, crossing Fore Point Channel by a pile bridge and draw: That the capital stock of said corporation should consist of the sum of seven hundred thousand dollars, divided into shares of. the par value of one hundred dollars each: That the said Midland Railroad Company, in and by said act, were authorized to cross the railroad of the said Boston and Providence Railroad Corporation, and in so doing were required to cross over the same with a clear height of seventeen feet above the top of the rail thereof, and leaving a roadway of fifteen feet each side of the centre line of said Boston and Providence Railroad free of obstruction : That the location of said Midland Railroad should be filed in accordance with law, in one year after the going into operation of the said last named act, and that the said Midland Railroad should be constructed within two years thereafter, and in default of such location and construction, that the said act should become void.

" The Boston and Providence Railroad Corporation further

inform, that the parties applying for the said last named act, at the hearing of their said application, exhibited a profile and a map showing the general outline and limits of the said proposed railroad; but the same, as the said Boston and Providence Railroad Corporation have been informed, was not filed in the library of the Commonwealth.

" The Boston and Providence Railroad Corporation further inform, that the parties in the said last named act of incorporation accepted the same, and thereby became bound by all the limitations in the said act contained: That the said Midland Railroad Company after the acceptance of the said last named act, to wit, on or about the first day of May 1851, did locate their proposed railroad, within the general limits as prescribed and required in the act aforesaid, and in conformity with the profile and map herein before mentioned; and did file the said location, on or about the second day of May 1851, with the county commissioners of the county of Norfolk.

" And the Boston and Providence Railroad Corporation further inform, that the grant of the power and right of location, so conferred by the act aforesaid, upon the Midland Railroad Company, by virtue of the location and filing thereof so made as aforesaid, became and was executed, and the limits of the said proposed railroad, by the said location, bound the rights of all parties, and thereby became certain, definite and fixed by law, and that the said Midland Railroad Company cannot lawfully go without the said location and the limits thereby established.

" The said Boston and Providence Railroad Corporation further inform, that the proposed railroad of the said Midland Railroad Company, by the said location, and the limits of the act authorizing the said road, if the same shall be constructed, will pass over the road of the said Boston and Providence Railroad Corporation, at a place or point in Dedham near the ten mile post of the said Boston and Providence Railroad.

" The said Boston and Providence Railroad Corporation further inform, that the legislature of this commonwealth, by its act passed May 24th 1851, authorized the said Midland Railroad Company to construct their railroad in sections of not less

than five miles each, commencing at the South Dedham termination of the said railroad, provided that said company should not commence the construction of any portion of the said road within ten miles of the said South Dedham termination of such road, until an amount of stock, equal to fifteen thousand dollars for each and every mile so to be commenced, should have been subscribed by responsible parties, and twenty per cent. thereof actually paid in to the treasurer of the said company; and upon the further provision and condition that the said company should not commence the construction of their road between a point on the line of the said road, ten miles from said South Dedham termination, and the termination of said road in Boston, until the whole capital of said road should have been subscribed by responsible persons, and twenty per cent. thereof actually paid in to the treasurer of the said company. And the said relators further inform, that by force of the said last named act and by force of the law, the said Midland Railroad Company are restrained from the construction of their said road, until their stock shall be subscribed for, and paid in as aforesaid: That they are restrained by law from constructing their road, after such subscription and payment, at any place without the limits of their charter as therein prescribed, and as by the aforesaid location, made and filed as aforesaid, they are bound to construct the same.

" The said relators upon information and belief further inform, that the stock of the Midland Railroad Company has not been subscribed for by responsible parties, and has not been paid in to the treasurer thereof, as is in the act aforesaid, passed on the 24th May 1851, provided and required to be done prior to any proceeding in, or commencement of, the construction of the said proposed railroad.

" The said relators upon information and belief further inform, that the said Midland Railroad Company, and Welcome Farnum and Edward Crane, persons claiming to exercise the rights and powers of the said Midland Railroad Company, propose to exercise and have begun to exercise, and have usurped and as yet usurp in contempt of law, a franchise and privilege to con-

struct a railroad from South Dedham to Boston, without having previously obtained a subscription of stock as aforesaid, and without having the same paid in to their treasurer as is required by law; that they propose to exercise and have usurped and as yet usurp, in contempt and violation of law, a franchise and privilege to construct a road from South Dedham to Boston without the limits of their charter, and without the location so as aforesaid made and filed by the said Midland Railroad Company, and in an entirely new, different and other course than such location, and have commenced the construction of a railroad which, if completed, will cross the railroad of the said Boston and Providence Railroad Corporation at a point more than six thousand feet from the point where the said Midland Railroad, if built according to said charter of said Midland Railroad Company and said location, would cross said Boston and Providence Railroad; and that certain persons claiming to act for the Boston and New York Central Railroad Company did, on the 27th day of April last, without warrant or authority of law, file in the clerk's office for the county of Norfolk, a paper called an amended or varied location, accompanied by a map by which a line of road is laid down coincident with the line of railroad so in process of construction, which said line the relators inform is without the location so as aforesaid filed on the 2d of May 1851, and without the limits thereof, and without the charter of said Midland Railroad Company; which several usurpations are in violation of the private right of these relators, and to their great damage and permanent injury, and in subversion of their business. These relators upon information and belief further inform, that the said Midland Railroad Company, and the said Farnum and Crane, persons claiming to exercise the rights of said company, in the exercise of the aforesaid usurpations, within the last four months began to construct, and are now constructing their proposed railroad in sections, to continue and are continuing the construction thereof, between a point on the line of said road ten miles from the South Dedham termination, and the termination at Boston, in the aforesaid new and unauthorized course.

" These relators upon information and belief further inform, that on the 29th of April 1854, the said Midland Railroad Company, without previous public notice and without notice to these relators, procured the passage of an act, of the legal effect of which these relators are not advised, wherein and whereby the Norfolk County Railroad Company, the said Midland Railroad Company, and the Southbridge and Blackstone Railroad Company were, upon certain terms, conditions and limitations, united into and as one corporation, in accordance with the provisions of chapter 158 of the acts of 1852, under the name of the Boston and New York Central Railroad Company : That the said Boston and New York Central Railroad Company have usurped and as yet do usurp, in contempt of law, without right, in connection with said Midland Railroad Company, and in connection with the said Farnum and Crane, to continue and carry into effect, and now are continuing, the said several aforesaid usurpations upon the rights, easements and liberties, of these relators, to their great loss, hazard and injury.

" These relators further inform, that the said Midland Railroad Company, and their said associates, the said Norfolk County Railroad Company, the said Southbridge and Blackstone Railroad Company, and the said Farnum and Crane, pretend that they have lawful right to construct the road of the said Midland Railroad Company, in such the aforesaid new route other than that described in their location so filed as aforesaid Whereas these relators charge and submit the contrary, that they have not, that neither of them has, any such lawful right or authority.

" Whereupon the said relators pray the consideration of the court in the premises, and that due process of law may be awarded against the said Midland Railroad Company, the Norfolk County Railroad Company, the Southbridge and Blackstone Railroad Company, the Boston and New York Central Railroad Company, Welcome Farnum and Edward Crane, in this behalf, to make them and each of them answer unto the Commonwealth, and these relators, by what warrant they, or either of them, claim to have the liberties, privileges and fran

chises, so as aforesaid set up by them, or either of them: That they, and each and every of them, their managers, servants and agents, may be injoined and restrained from exercising the fran-chise, right or privilege, so set up and usurped by them; that they may be restrained from crossing over or under the railroad of these relators until the further order of the court; and that the attorney general of the Commonwealth may be notified of the filing and pendency of this information.

" These relators further inform, upon information and belief, that each and every the aforesaid corporations, and the said Crane, have their usual place of business in Boston, and that the said Farnum resides at Blackstone, in the county of Wor-cester."

By order of the court, notice was given to the Midland Rail-road Company, the Norfolk County Railroad Company, the Southbridge and Blackstone Railroad Company, the Boston and New York Central Railroad Company, Welcome Farnum and Edward Crane, to appear before the court on the 6th of June, and show cause why leave to file this information should not be granted; and notice of the pendency of the petition was served on the attorney general; but he did not intervene.

At the hearing before the chief justice, on the 6th of June, it appeared in evidence that the Midland Railroad Company, on the 2d of May 1851, within a year from the date of their incor-poration, filed a location with the county commissioners of the county of Norfolk; that they did not build their road according to this location; but subsequently, on the 27th of April 1854, under a claim of right to do so, either by a special authority conferred by special law, or under the provisions of the general laws of the Commonwealth, filed another or amended location, on a different line from the former one, and taking a more northerly direction; that the new location begins at the same point in South Dedham on the Norfolk County Railroad, but, instead of leaving that road at once, follows the line thereof for two miles or more, approaches more nearly the principal village of Dedham, and departs more widely from the westerly line of the town of Canton, and crosses the Boston & Providence Rail-

road more than a mile north of the point, at which the first location would cross it. The points of difference between the two locations, so far as they are material to the understanding of the points of law decided, are stated in the opinion. It also appeared, that the respondent corporations, which, since these locations, by various acts of the legislature, had been united and formed into one corporation, under the name of the Boston and New York Central Railroad Company, so as to make one line of road from South Dedham, and south and west thereof to Boston, had abandoned the first location, and were proceeding to build a railroad conformably to the second location.

In order to show the injurious effect of this last location upon the business and profits of the petitioners as proprietors of the Boston and Providence Railroad, and the branches thereof to the village of Dedham, constructed by them under the authority of *Sts.* 1834, *c.* 171, and 1848, *c.* 273, the petitioners offered the affidavits of William R. Lee and Simeon Borden.

William R. Lee testified, that for many years next preceding the 1st of October 1853 he was officially connected with the Boston and Providence Railroad Corporation, and that he was fully acquainted with the course of its business and the sources of its income; that said corporation had expended large sums of money for the purpose of securing and accommodating the travel between Boston and Dedham, and that said travel was large, and the proceeds of it an important source of income to said corporation; that the road of the respondents, if built according to the new location, would be a competing line for a considerable portion of the business between Boston and Dedham, now done by the petitioners, and would have a much greater and more injurious effect on their interests, than a road built according to the first location, and that the road last mentioned would not have any material effect on the local business of the petitioners.

Simeon Borden testified, that he was by profession a civil engineer, and was employed to make the surveys preparatory to the application of the Midland Railroad Company for a charter in 1850; that he made such surveys and a map and profile of

the proposed road; that that map and profile were exhibited to the committee of the legislature before whom said application was heard, and were the only ones so exhibited; that he was examined as a witness before said committee, and that, so far as he knew or believed, no other surveys were made in reference to the subject, than those so made by him; that he left the map and profile with the committee, and had not seen them since, but had seen a copy of them, within a year, in the hands of Theodore Atkinson, the engineer of the Boston and New York Central Railroad Company; and that the first location filed by the Midland Railroad Company was in accordance with said map.

The petitioners also insisted that the respondents had no right to exercise the franchise and privilege exercised by them, because the payment of the capital to the amount of $140,000 was a condition precedent to the right; that said sum had not been subscribed for and paid in; and consequently that the exercise of the franchise and privilege in question was unauthorized and a usurpation.

The respondents contended, first, that the petitioners had no private right or interest, which was injured or put at hazard by the doings of the respondents, and therefore had no right nor authority, under the statute, to file this information; and secondly, that the respondents had good right and lawful authority to file the second and amended location, and to lay out, construct and maintain their railroad accordingly.

In order to show that they had reasons for changing the first location, they called Theodore Atkinson, civil engineer, and at present the engineer of the Boston and New York Central Railroad Company, who testified, that he made the surveys and fixed the route, conformably to which the amended location was made; that it commenced in South Dedham, and ran through the southerly part of Dedham, at a distance, as he estimated it, of about two hundred rods from the westerly line of Canton; that, when he took charge of the road, he sought for the best and cheapest route from South Dedham to Boston, within the limits of the charter; that the first route would require the road

to pass, to a great extent, over the Fowl Meadows, which are low and level; and that this would require a high and expensive embankment for a long distance over those meadows, in order to carry the railroad over the Boston and Providence Railroad at a height of seventeen feet, as required by the charter; that, by the route which he selected, the railroad was kept on higher ground, and crossed the Boston and Providence Railroad by an embankment of only five or six feet, where that road passed in a deep cut; that this crossing would certainly do no injury to that road; that the change of route was made by his advice, and that he was governed solely by a consideration of the cheapness and fitness of the route; that there was a hill in pursuing the route easterly, to avoid which it was necessary to pass somewhat more northerly, and nearer the village of Dedham than it would otherwise have done; that the new route ran for about two miles along and on the route of the Norfolk County Railroad heretofore laid out; that one consideration of the cheapness was, that it would thus run some distance on another railroad; that the two corporations were not then united, but he supposed there was some identity of interest between them, and that the Midland Railroad Company would not have to pay any damage to the Norfolk County Railroad Company; that the new route crossed public roads ten or twelve times, and the old one crossed public roads five or six times.

The case was reserved by the chief justice for the consideration of the whole court, upon a report, which concluded as follows: " It appearing to me that there is little or no controversy about any facts in the present case, and that the questions arising thereon are mainly questions of law, and that it would facili‧ tate a final decision to bring these questions of law before the whole court, I proposed, with the consent of the parties, to submit the case on a report.

" The principal questions of law appear to me to be these: 1st. Have the petitioners any such private right or interest, injured or put at hazard, by the exercise of the franchises or privileges claimed by the respondents, as to bring them within the provisions of the statute, and give them a right and authority as

complainants or relators to file and prosecute the proposed information, either, first, because it deprives them of the profits on carriage of passengers and transportation of merchandise; or, secondly, in interfering with their road injuriously, in crossing it where the respondents now propose to cross it; or, thirdly, in any other matter set forth in the information?

" 2d. Had the respondents, after filing the first location, a right to relinquish the route specified therein, and file a new location, and a right to proceed and lay out their road, and make and maintain it according to such new location?

" 3d. Is the amended location, running as it does, such, that if it had been the original location, and seasonably filed, it would have been within the limits prescribed by the charter, and authorized and warranted by it?

" 4th. Was the subscription for stock, to the amount of seven thousand shares, required, or only authorized; if required, is it a condition precedent to the use and exercise of the franchise and powers given by the charter, so that the acts done under color of the charter would be a usurpation?

" I have stated these as the principal questions requiring the attention of the court; but it is not to preclude either party from presenting any other question properly arising in the case, or upon the special or general acts of legislation which may be cited.

" If the whole court are of opinion that the petitioners ought to have leave to file the proposed information, they will so order; otherwise, the application will be dismissed."

The arguments were had on the 12th of June 1854.

*S. Bartlett & C. B. Goodrich,* for the petitioners. The object of this application is to restrain the construction of about three miles of road, which, the petitioners aver, will be injurious to them, and not warranted by law.

1. The petitioners have an easement in the land over which their main and branch roads pass; and an interest in its use or employment by the public; and such easement and interest constitute " a private right or interest," within the meaning of *St.* 1852, *c.* 312, §§ 42, 44, which the respondents have injured

and have put in hazard, by the exercise of a franchise usurped. *Pennsylvania* v. *Wheeling & Belmont Bridge*, 13 How. 518. *Clarence Railway* v. *Great North of England &c. Railway*, 3 Gale & Dav. 389, and 4 Ad. & El. N. R. 46. *Manchester, Sheffield & Lincolnshire Railway* v. *Great Northwestern Railway*, 9 Hare, 284. *Irwin* v. *Dixion*, 9 How. 10. *Walker* v. *Eastern Counties Railway*, 6 Hare, 594. *Colman* v. *Eastern Counties Railway*, 10 Beav. 1. *Bradbury* v. *Manchester, Sheffield & Lincolnshire Railway*, 8 Eng. Law & Eq. R. 143. *Blakemore* v. *Glamorganshire Canal*, 1 Myl. & K. 154, 162.

2. The respondents, by the terms and true construction of their charter, *St.* 1850, c. 268, have no authority to construct their road according to the amended location. The principle, that the rule of construction of charters of this character is, in cases of doubt, adverse to the corporation, is well settled; and its policy rests in part on the consideration that third parties, whose rights are to be affected, have but little opportunity to protect themselves while such grants are being made. *Stourbridge Canal* v. *Wheeley*, 2 B. & Ad. 792. *Webb* v. *Manchester & Leeds Railway*, 4 Myl. & C. 120. *Scales* v. *Pickering*, 4 Bing. 452. *Blakemore* v. *Glamorganshire Canal*, 1 Myl. & K. 154. *Stockton & Darlington Railway* v. *Barrett*, 11 Cl. & Fin. 590. *North British Railway* v. *Tod*, 12 Cl. & Fin. 722. Grant on Corp. 31, 32. *Parker* v. *Great Western Railway*, 7 Man. & Gr. 288. *Attorney General* v. *Parmeter*, 10 Price, 378, 412, and 1 Dow, 316. *Beardmer* v. *London & Northwestern Railway*, 5 Railw. Cas. 728, and 1 Hall & Twells, 161. *Breynton* v. *London & Northwestern Railway*, 10 Beav. 242. *Beaty* v. *Knowles*, 4 Pet. 168. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 546. *Mills* v. *St. Clair County*, 8 How. 569. *Springfield* v. *Connecticut River Railroad*, 4 Cush. 63. The most nearly contemporaneous acts of the defendants, namely, their entry and original location under their charter, and filing the location with the county commissioners, coupled with the fact that such location was in conformity with the plan exhibited by them to the legislature pursuant to law, are strong evidence, if not conclusive against the defendants, as to the true construction of their char-

ter. Rev. Sts. *c.* 39, §§ 46–48. *Sts.* 1848, *cc.* 140, 327; 1849, *c.* 131. *Stone* v. *Clark*, 1 Met. 378. *Blaney* v. *Rice*, 20 Pick. 62. *Blake* v. *Doherty*, 5 Wheat. 359. But, aside from the acts of the respondents, the terms of the charter show that the attempted new location exceeds the rights granted by it. The new location, instead of commencing at a point on the Norfolk County Railroad, and "thence" departing from that road, and running through the southerly part of Dedham, runs upon the actual location of that road for more than two miles; and instead of running "through or near the westerly part of the towns of Canton and Milton," it only approaches the northwest corner of Canton, and then runs near the westerly boundary of Milton, to Dorchester. "Town," in this statute, means the village or collection of houses. *Elliot* v. *South Devon Railway*, 5 Railw. Cas. 500, and 2 Exch. 725.

3. If the *St.* of 1850, *c.* 268, could be so construed as to have allowed an original location in the route now attempted, yet the respondents, having duly filed their location within one year, as required by their charter, cannot, after the expiration of that year, file a new and distinct location. *Dun River Navigation* v. *North Midland Railway*, 1 Railw. Cas. 135. *Brocklebank* v. *Whitehaven Junction Railway*, 5 Railw. Cas. 373, and 15 Sim. 632. *The Queen* v. *Birmingham & Oxford Junction Railway*, 15 Ad. & El. N. R. 634. *The Queen* v. *Commissioners of Woods & Forests*, 15 Ad. & El. N. R. 774. The original location bound the land over which the road was to pass, and created between the company and the several land-owners the *quasi* relation of vendor and vendee, which relation cannot now be changed nor applied to other land. *Davidson* v. *Boston & Maine Railroad*, 3 Cush. 91. *Charlestown Branch Railroad* v. *County Comm'rs*, 7 Met. 78.

Section 73 of Rev. Sts. *c.* 39, authorizing a railroad corporation, "after having taken land for any portion of their road," "to vary the direction of the road in the place where such land is situated," does not authorize this new location. The change is limited to the space of five rods, authorized to be taken by § 54, and constituting the first location filed; or, at most, to a variation of the direction or line to avoid unexpected partial or local

30\*

obstructions or difficulties, but nevertheless leaving the route in general conformity to the location as originally made. This appears from the limitation of such variations to the place where the land first taken is situated. And to hold that the original location may be wholly disregarded, and a new one made over the whole line, and that again changed *toties quoties* until the time allowed for completing the road is exhausted, would defeat the whole policy of the law. By Rev. Sts. *c.* 39, § 75, " every railroad corporation shall, in all cases, file the location of their road within one year, with the commissioners of each county," &c. This policy is founded on the consideration, that the business of the public, and the value and uses of property on the line of the road, are more or less affected by the final determination of the route. The objection in this case is even stronger; for the charter of the respondents was to be void by its own terms, if the location should not be filed within one year. *St.* 1850, *c.* 268, § 5. The several acts, extending the term for the construction of the respondents' road, were passed upon the ground that their location had been completed according to the charter, and extended the time of construction only for their road as thus located. *Sts.* 1852, *c.* 47; 1853, *c.* 311; 1854, *c.* 447. The Midland Railroad Company and the legislature have regarded the original location as an execution of the grant, which neither party can change without the consent of the other. The general certainty of the route described in the charter, by a location in the manner required by the charter, has become certain to a certain intent.

4. The Midland Railroad Company cannot proceed in the construction of their road until they shall have subscribed for the entire capital stock, and shall have paid twenty per cent. thereof. *St.* 1851, *c.* 335. Rev. Sts. *c.* 44, § 23. *Regina* v. *Eastern Archipelago Co.* 1 El. & Blackb. 310.

*R. Choate & G. W. Cooley,* for the respondents. I. These petitioners are not entitled to an information for the purpose of trying the question of usurpation. They do not show that they have any private right or interest injured or put in hazard, within the meaning of *Sts.* 1851, *c.* 233, §§ 55, 57, and 1852, *c.* 312,

§§ 42, 44. These statutes give a new remedy, but no new right or interest. The words " right or interest," in these statutes, mean some known or recognized legal or equitable right, and on which, as the law stood in this state, when the statute of 1851 was passed, an action at law or bill in equity could have been maintained. When a statute uses words whose meaning is well ascertained by the existing jurisprudence, they shall be under-stood in that meaning, unless the context displaces such construction and clearly sets up another meaning. *Merchants Bank* v. *Cook,* 4 Pick. 405. *Ex parte Hall,* 1 Pick. 261. *Snell* v. *Bridge-water Cotton Gin Manuf. Co.* 24 Pick. 298. *United States* v. *Curtis,* 4 Mason, 232. *United States* v. *Clark,* 1 Gallis. 501, 502. *United States* v. *Coffin,* 1 Sumner, 394. *Adams* v. *Wiscasset Bank,* 1 Greenl. 361. *Campbell* v. *Thompson,* 16 Maine, 117. *Kitchen* v. *Tyson,* 3 Murph. 314. " Right" and "interest" have a well ascertained meaning in our jurisprudence of law and equity, and are legal synonyms. 2 Burrill Law Dict. 628, 899, 900. *Northampton* v. *Smith,* 11 Met. 390. *New York* v. *Mapes,* 6 Johns. Ch. 46. If the statute did not use these words in their accepted legal and equitable sense, it would proceed to define, enumerate and circumscribe the rights and interests intended; for otherwise, it does not express what it means.

No right or interest of the petitioners is injured by any non-payment of the capital stock of the Midland Railroad Company; for they do not pretend to be creditors of that corporation. Nor are they injured, in the use of their easements, by the crossing of the railroad by that of the respondents, even if at an unauthorized place. They have no cause of action, even for nominal damages. For no injury is done, as appears by Atkinson's evidence; and therefore no right is invaded. *Atkins* v. *Bordman,* 2 Met. 457. *Read* v. *Leeds,* 19 Conn. 182. *Quimby* v. *Vermont Central Railroad,* 23 Verm. 387. Nor could an injunction be had for so crossing, upon an allegation of nuisance to the ease-ment; for no damage is thereby done to the easement; and the possibility of falling upon or otherwise injuring the easement is no ground of injunction. Drewry on Injunction, 248. If the place of crossing will bring the respondents' road into more

severe competition with the petitioners'; and will bring this travel over the respondents' road, which would go over the petitioners'; this injures and hazards no private right or interest, in the absence of any stipulation in the petitioners' charter.   *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420.

II. No usurpation is proved.

1. The original charter does not require the payment of the capital before proceeding to build.   *St.* 1851, *c.* 335, is a private act, making a grant of a privilege to build in sections, upon a strict condition, applicable to, and exhausted on, that grant; and as the grant was not accepted, but the entire road built, not by sections, the condition does not take effect.   Private acts are to be construed like conveyances or contracts between the parties.   *Hornby* v. *Houlditch*, 1 T. R. 93, *note.   Scales* v. *Pickering*, 4 Bing. 448.   *Thomas* v. *Mahan*, 4 Greenl. 513.   If the legislature intended this statute as an independent and peremptory enactment, they would have used other and clearer language.   Even if this was a restriction on the Midland Railroad Company, it does not bind the consolidated corporation.   The condition can no longer be strictly performed, for no capital stock of the Midland Company can now be created or exist. The non-payment of the stock does not make the building of the road the exercise of a privilege not conferred by law, but, at worst, only the exercise of a privilege in an illegal way.   Unless the court sees that the public must suffer, for the want of means in the respondent, it will not permit an information to be filed. Angell & Ames on Corp. (4th ed.) § 698.

2. There is no illegality in the place of crossing, or route of approaching or leaving the petitioners' road.   If such had been the original location, it is within the charter.   The road of the Midland Company is to start *on,* not *from* the Norfolk County Railroad, as contended by the petitioners.   The word " near ' is indeterminate and vague; and therefore it is to be intended that some discretion was granted to the respondents; and unless the distance be such as to prove bad faith towards the legislature and a fraud on the charter, there is no usurpation.   Atkinson's testimony repels all suggestion of bad faith, and shows that the road was selected on proper reasons.

**3.** The change of location is authorized by law, as appears by an examination and comparison of the provisions of Rev. Sts. *c.* 39, §§ 54, 55, 73–76; *Sts.* 1830, *c.* 4, § 1; 1833, *c.* 187, §§ 1, 2, 7; 1835, *c.* 148, § 3.

Shaw, C. J.* The object of this petition is to obtain authority to file an information, in the nature of a *quo warranto*, against the Midland Railroad Company and several other corporations, now consolidated into one by the name of the Boston & New York Central Railroad Company. This proceeding is founded on the practice act of 1852, §§ 42–50, being, in this respect, in the same terms as the practice act of 1851, §§ 55–64. Section 42 of the statute of 1852 provides. that any person, whose private right or interest has been injured, or put at hazard, by the exercise, by any private corporation, of a franchise or privilege not conferred by law, may apply to this court for leave to file an information in the nature of a *quo warranto*. The succeeding sections, to § 50 inclusive, make various provisions for the mode of proceeding; giving notice to the attorney general, that he may intervene in behalf of the Commonwealth if he shall think fit; directing how the prosecution shall be conducted, and what judgment may be rendered, in case the attorney general shall or shall not intervene; to what extent the petitioners or relators shall be liable for costs; and generally prescribing suitable regulations, adapted to such a proceeding. The statute provides that application for leave to file the information may be made in any county, and thereupon the court shall take order for the summary hearing of the parties.

The first, and, as it appears to us, by far the most important question, now brought before us, is, whether the corporation now known as the Boston and New York Central Railroad Company had authority by their charter, under the name of an amended location, to make and file the location which they did make on the 27th of April last, and thereupon to proceed and lay down their railroad, from South Dedham to Boston, on the line of such new or amended location, to place cars thereon, and become

---

* Bigelow, J. did not sit in this case.

carriers of passengers and merchandise thereon, as public carriers for hire. Indeed, it is this new location, of which the petitioners complain, as affecting their rights and interests injuriously, by coming much nearer to the principal village of Dedham, thereby becoming a collateral and rival road, and thus injuriously affecting them, as well on their main line, as on the branches which they are authorized by law to make and maintain, and which at great expense they have made, and also by crossing the track of their main line, at a place not authorized by their first location, but at a mile distant therefrom, and, as they allege, not authorized by law.

In order to see whether this late location, made by the Central Railroad Company, was justifiable, it is necessary to examine their charter. In doing so, they will be found to be a consolidated corporation, composed of three preëxisting incorporated companies, namely, the Norfolk County Railroad Company, the Midland Railroad Company, and the Southbridge and Blackstone Railroad Company. The Midland Railroad Company were incorporated by *St.* 1850, *c.* 268, and made subject to the duties, liabilities and restrictions, and invested with all the powers and privileges, set forth in Rev. Sts. *c.* 44, and in that part of *c.* 39 relating to railroad corporations, and all other general laws, which had been or should be passed, relative to railroad corporations. It will not be necessary to look at the other parts of this act at present. This act seems to have contemplated in the outset a union of this corporation, provisionally, with the Norfolk County Railroad Company and the Southbridge and Blackstone Railroad Company, in this commonwealth, and also with two corporations in the State of Connecticut, so as to form one continuous line of railroad to and through Connecticut. By *St.* 1852, *c.* 158, some similar union seems to have been contemplated. But whether those acts would have warranted the union afterwards formed between the three corporations, it seems hardly necessary to inquire, because by a very recent act, *St.* 1854, *c.* 447, the proceedings of these corporations, whereby, on the 12th of December 1853, they united themselves into one corporation, under the name of the Boston and New

York Central Railroad Company, in accordance with the last act above cited, are ratified and confirmed.

By these proceedings, thus ratified, the consolidated corporation succeeded to, and became entitled to exercise all the powers and privileges, and subject to the duties and obligations, of each of the three corporations, as they then stood, and as they were respectively affected by their several acts of incorporation, and by the acts done, the obligations incurred and property held under them. The question therefore resolves itself into this; whether the Midland Railroad Company, at the time when this union was formed, had the legal right and authority to file the new or amended location, which was filed by the Central Railroad Company in April last, and to proceed to build their road conformably to this new location?

This, like every other question respecting the powers of railroad companies, must depend on the statutes of the Commonwealth; and very little aid can be derived from English judicial decisions on this subject, because the provisions of their acts of incorporation, and their whole course of proceeding, differ so much from our own. The act incorporating the Midland Railroad Company, St. 1850, c. 268, § 5, provides that if the location of said road shall not be filed in one year, and the railroad constructed in two years, the act shall be void. This provision, so far as filing the location is concerned, merely declares, what would have been the law, by force of the general railroad act, to which this act of incorporation is made in all respects subject. Rev. Sts. c. 39, § 75. " Every railroad corporation shall, in all cases, file the location of their road within one year, with the commissioners of each county through which the same passes, defining the courses, distances and boundaries of such portion thereof, as lies within each county respectively."

If this provision stood alone, it would seem to be entirely decisive. It shows clearly enough the purposes for which a location is intended, and declares what it shall contain, to wit, the courses, distances and boundaries of the road. To define the boundaries of the road is to prescribe lines, within which the land is taken, and beyond which it is not taken, and it is neces-

sarily exclusive. This location, whatever may be the effect of it, must be made within a year. But the respondents say, that they complied with this requirement; but, having filed their location within a year, they insist that they have authority by the same act, if they find it expedient, to vary the direction of the road, provided it be done, and a location of such alterations filed, before the time required by law for completing their road. This authority is found in Rev. Sts. *c.* 39, § 73. " Any railroad corporation, after having taken land for any portion of their road, may, if they shall find it expedient, vary the direction of the road in the place where such land is situated; provided, they shall not thereby locate their road, or any part thereof, without the limits prescribed by their act of incorporation; and they shall, before the time required by law for completing their road, file the location of the different parts of the road, where such variations are made, with the commissioners of the respective counties, where said parts of the road are situated, or with the mayor and aldermen of the city of Boston, as the case may be; and provided also, that the time, allowed by law for completing the whole road, shall not be extended in consequence of such variation."

It is difficult to put any satisfactory construction upon this section, but it must be construed, as all other sections and parts of statutes are construed, by a reference to every other part of the statute, and in this case to the whole of the revised statutes, which constitute one act, going into operation at the same time

The provision for alterations is, " after having taken land for their road." Looking at other parts of the act, it is manifest that the purpose of filing the location is to define and specify the boundaries of the land, which the corporation appropriate; and the effect of the location is to bind the land described to that servitude, and to conclude the land-owner and all parties having derivative interests in it, from denying the title of the company to their easement in it. We think therefore that the filing of the location is the taking of the land. It is upon that, that the owner is forthwith entitled to compensation; it is that act, which gives the easement to the corporation, and the right

to have damages to the owner of the land. It was so held in a late case, and further held that the filing of the location is the taking from which the three years are to be computed, within which a claim must be made for damages. *Charlestown Branch Railroad* v. *County Commissioners,* 7 Met. 78.

In a later case, it was intimated that it was the duty of the railroad corporation to file their location, which however they might fail to do; that therefore, if without a location the corporation should enter upon land and proceed to make their road, in favor of the owner and as against the corporation, this might be deemed such an actual taking, as would warrant him to proceed and claim damages; or rather that the corporation, under such circumstances, would be estopped to deny that they had taken his land. *Davidson* v. *Boston & Maine Railroad,* 3 Cush. 106. But this is not at all inconsistent with the position, that filing a location is a taking.

If, after having thus taken land by a location, they may vary the direction of the road, how far and in what mode shall this variation extend? The right or power to vary is made to depend only on their own views of expediency. But it is provided, that they shall not thereby locate their road, or any part thereof, without the limits prescribed by their act of incorporation. We think some light may be thrown on this provision by looking at the previous acts. This provision for varying the direction was not first introduced in the revised statutes, but seems to have been part of the early railroad system, and is first found in a prior general railroad act, *St.* 1833, *c.* 187, § 7; which, however, contained no restriction that the variation must be within the limits prescribed by their act of incorporation. But this was followed, two years after, by *St.* 1835, *c.* 148, § 2, providing that this section should not apply to any railroad corporation, the location of whose road is particularly described in their act of incorporation. Both of these were in force, when the statutes were revised, and are in effect embodied in § 73, by still authorizing the variation, if the corporation shall find it expedient, provided it be within the limits prescribed by the act of incorporation.

Here we find what is meant by "limits prescribed in their act of incorporation," and that it means the same thing as "location," a definite line of road described, which leaves nothing to be done, but to lay it down and mark it on the ground, and leaves no room for variation.

It is also illustrated by contrast with the ensuing section, § 74, (since repealed by *St.* 1846, *c.* 9,) which authorizes a corporation not at their own discretion or view of expediency, but upon a grant of authority, by the county commissioners, to make an original location or alter an existing one, *without* the limits prescribed.

Thus construed, with the aid of contemporaneous provisions and of prior acts, the meaning of § 73 appears to us to be this : If the act of incorporation itself has fixed the termini and intermediate stations or local objects described, with the courses and distances between them, it is itself a location, and there is no room for variation. If it has fixed the termini, and any fixed intermediate stations, without courses and distances, this section warrants a variation between the fixed stations, but no further ; the intermediate fixed stations, as well as the termini, are limits, and must be observed. But if there be no fixed intermediate stations, these variations may be made anywhere between the termini, subject only to be controlled by such qualifying terms of a general nature as the act may contain, such as north of such a hill, west of such a pond, or near such a town, or over such a meadow, where the meadow is a broad one. Whatever in the act prescribes limits, more or less definite, excludes variations beyond those limits.

It was argued against this construction, that it would be unreasonable to allow a private corporation, after appropriating one portion of land to their road, at their discretion to take another portion, without the five rods already taken, and that therefore this § 73 must be construed to authorize variations within the five rods only. But we think it impossible to agree to this construction. It is the strip of five rods, not the iron track within which constitutes the road, and the line of the road. The corporation have no need of such a variation ; they may lay their

track in the middle or on either side of this strip, at their plea-sure. Further, § 76 provides, that " every railroad corporation shall be liable, as well to the owners of the lands first taken, as to the owners of those taken for making such variations, for all damages occasioned by taking the same." This is decisive that the lands, contemplated to be taken by the variations, are other and distinct from those taken by the original location. Indeed, this provision, that the corporation shall be liable for both par-cels of land taken, may afford some security against any abuse of this authority, by making capricious and unnecessary variations.

It was argued by one of the counsel, that this Midland Rail-road Company stood upon a somewhat different footing, because their own charter, *St.* 1850, *c.* 268, § 5, provides, that if the loca-tion of said road shall not be filed in one year, and the railroad constructed in two years, the act shall be void. We cannot per-ceive that this distinguishes it from corporations generally. The location was filed within one year. By the general clause in their act, the corporation were entitled to all the powers and privileges set forth in Rev. Sts. *c.* 39, one of which is, if the fore-going construction is right, that of making variations and fil-ing them, at any time within the time limited for the completion of the road.

Another argument is founded on the peculiar phraseology of the statute. Section 73 provides that a railroad corporation, having taken land for any portion of their road, may, if they find it expedient, vary the direction of the road, " in the place where such land is situated." The argument is, that this clause restricts the right of variation to some narrower limits, than it might otherwise have. It is certainly difficult to see what was intended by it. If it restricts it, as the literal construc-tion imports, to the place, where the land (taken) is situated, it must keep it in the original place, admit of no variation at all, and thus be self-contradictory. A nearly similar expression is used in *St.* 1833, *c.* 187 ; but the words stand in a little differ-ent order. On the whole, we are inclined to think, that the words " in the place where " qualify " road " so as to describe it as the road lying or being in the place, or in any place, wherein

such land, (the land taken,) is situated. In this sense, it adds very little to the meaning of the words " in any place," but in no sense can we perceive that it means any more.

On the whole, the court are of opinion, that the Central Railroad Company, succeeding to the rights of the Midland Railroad Company, had power, within the time limited, to make variations in the direction of their road, within the limits of the act of incorporation of the Midland Company, and to file an amended location, expressing their variations, within the time limited by law. This at first view seems to be a very large power to be vested in a corporation; but looking at the great latitude allowed by the legislature, in view of the great public improvements expected, to railroad companies, by their own engineers, managers, and directors, to lay out railroads originally with a great range of selection, this power to vary, after one location, and after a more thorough knowledge of the ground and its capacity for the purpose intended, and to adopt another, differs very little from the power originally given to select one line within a wide space.

It remains to inquire whether the amended location was filed in due time. The provision we have been considering, § 73, is thus : " And they shall, before the time required by law for completing their road, file the location of different parts of the road, where such variations are made," &c. This fixes the time within which the amended location must be filed, as the time, in each case, limited for the completion of the road.

By their act of incorporation, the Midland Railroad Company were required to construct their railroad within two years from the passage of the act, May 2d 1850. By *St.* 1852, *c.* 47, the time was extended two years, making the entire time four years, to May 2d 1854. And by the act consolidating the three corporations, the time allowed the consolidated company, to construct that part of the road which was originally to be built by the Midland Railroad Company, was extended one year from the time then allowed by law. *St.* 1854, *c.* 447, § 2. This extends the time for completing the road, and consequently for filing the amended location, to May 2d 1855.

It was said in argument, that these acts, extending the time for the construction of the road, were passed upon the ground, that their location had been completed, according to the charter; and extended the time of construction only for their road, as thus located. But we see no evidence of this, in the acts themselves. No allusion is made to the location, except in *St.* 1853, *c.* 311, which is not one of the acts extending the time, requiring them to alter their location, in one part, where it passes South Boston, and crosses the channel into Boston. In all other respects, they are left to their rights in regard to location. If it is intended by the argument, that the legislature assumed that the location had become fixed and unalterable by the first location, it is only repeating the argument in another form, and may be answered by the suggestion, that by law the corporation had still power to vary their location; then the legislature did not act upon the ground that it was fixed, and their acts have no tendency to fix it. Those acts therefore give an unconditional extension of time, and place the corporation on the same footing as if such extended time had been originally given.

The next material question is, whether the amended location made and filed on the 27th of April 1854, including a part of the original location and the variations, was a location within the limits of the act of incorporation; or, in other words, had it been a new and original location, first made under the charter, without objection as to time, would it have been authorized and warranted by the charter.

By § 2 of the act of incorporation of the Midland Company, " the said Company are empowered to locate, construct and maintain a railroad, with one or more tracks, commencing at some convenient point on the Norfolk County Railroad in South Dedham; thence through the southerly part of Dedham; thence through or near the westerly part of the towns of Canton and Milton to the town of Dorchester; thence in a northeasterly direction, through the town of Dorchester," &c. This embraces all that part of the location, respecting which the question arises.

This is, to a considerable extent, a question of fact, depending

31 *

on evidence set forth in the report; and it is difficult to make it intelligible, without the large map, used at the trial as part of the case, on which both locations are distinctly laid down. The question must depend upon comparing the actual location made, with that authorized by the charter. A glance at the charter, as cited above, will show how large a latitude was allowed to the corporation, within which to make their location. The *terminus a quo* is not a fixed station; it is a point on any part of the Norfolk County Railroad in South Dedham, which would allow them to select any point on a line of three or four miles; no intermediate station or fixed monument or point is designated, no course or distance or other indication of direction, nothing approximating to a description more closely, than " through the southerly part of Dedham, through or near the westerly part of Canton and Milton," and into Dorchester, without alluding to any point. We have examined the evidence, and are of opinion that the variations made by the company are not beyond the limits prescribed by the act of incorporation; and that, if the same location had been originally made, it would have been warranted by the charter.

Without going much into detail of the evidence, which leads to this conclusion, we will consider a few of the leading objections to this result.

The petitioners insist that the company themselves put a construction upon their charter, by their earliest and most nearly contemporaneous acts, in entering and filing their first location, coupled with the fact, that such location was in conformity with the plan exhibited by them to the legislature, under which they obtained their grant. In regard to this last fact, no such plan has been produced; nor do we think any such plan, not referred to in the act, could be evidence. It would be admitting evidence *aliunde* to show the intent of the legislature in a legislative act; whereas the statute itself, duly authenticated, is the only evidence that such act has received the sanction of all departments, necessary to give it the force of law. *Commonwealth* v. *Fitchburg Railroad,* 8 Cush. 240. *North British Railway* v. *Tod,* 12 Cl. & Fin. 731, 738. If it be urged that the act of first location is

evidence of the respondents' view of the true construction and limits of their charter, the answer is, that it was provisional and not definitive, subject to be altered and amended on further examination, if thought expedient, and so no evidence of their view of the extent and limits of their powers.

Again; it is argued that the location, by the act, is to commence at a point on the Norfolk County Railroad, and thence to depart from that line and run thence through the southerly part of Dedham, whereas in fact it runs from the *terminus a quo* more than two miles, not from, but on and over the actual location of the Norfolk County Railroad. This we think is a misconstruction of the language of the act. It commences at some convenient point on the Norfolk County Railroad in South Dedham, *thence,* not from that railroad or the line of that railroad, but from a point on that railroad, which it may do, if it continues to run from that point three miles on that railroad, and so must run through the southerly part of Dedham, if that railroad is in the southerly part of Dedham, which the act implies. Though the act of incorporation did not fix any point on the Norfolk County Railroad, yet in point of fact both locations assume the same station, as the starting point.

Another objection is, that it does not pass through or near the westerly part of Canton and Milton. But "near" is a vague term. It was not required to pass through those towns, and without passing through, it could not well pass much nearer, because Neponset River is the dividing line. The objection appears the stronger, from a comparison between the two locations, the former having passed for a long distance over the meadows, and for some distance in a line parallel, or nearly so, with the river and the westerly line of Canton. The engineer has given his reasons for changing the location, and satisfactory grounds to show that it was not done through caprice, or with any improper motive, but for good cause. As it is, it now runs within about two hundred rods of the northwesterly corner of Canton, and this, we think, does not exceed the limits, allowed by the act.

Another ground, on which it is argued that the company by

their acts have exceeded the limits of their charter, is, that by the amended location the road of the respondents will cross the main line of the petitioners' road, at a distance of a mile or more farther north, than it would have done by the first location. No evidence has been offered to show, that crossing their road at the new location will be more burdensome or dangerous than at the old; in either, the respondents must cross over the petitioners' road, at the height of seventeen feet, and make the embankments and works incident to such crossing, at their own expense. Indeed, although some increased burden was suggested, the argument is not ultimately based on that fact, but on the ground, that any crossing of the petitioners' road, to an easement in which they had previously acquired a vested interest, not authorized by the charter of the respondents, is the exercise of a franchise not warranted by law, and a usurpation. This would be a very just conclusion, if well warranted by the premises. But the act of incorporation nowhere directs where the Midland Railroad shall cross the Boston and Providence Railroad. The argument then is founded on the assumption, that the first location fixed the line of the road, and thereby fixed the point of crossing, and made that certain, which before the first location was not so. But this depends upon the fallacy, if it be one, that any variation in the direction of the road, from the first location, would be without the limits prescribed by the act of incorporation. But we think they are obviously very different things; and if we are right in the foregoing views, regarding the right of variation, then the point for crossing the petitioners' road was not fixed, and fixing the point at another place lower down, on the line of the amended location, is not a usurpation, or the exercise of an authority not warranted, but an act done in pursuance of the power given them by the act of incorporation.

One other ground was taken by the petitioners, to show that the respondents had violated their charter; namely, that by the *St.* 1851, *c.* 335, the Midland Railroad Company were bound to have their whole capital stock subscribed for by responsible persons, and twenty per cent. paid in, as a condition precedent to their proceeding, and that this had not been done.

The first suggestion in answer is, that if it be so, it is of no concern to the petitioners; it cannot affect their rights. This is not quite a satisfactory answer. The first question is, whether the respondents have usurped a franchise not granted; the consequences are an after consideration. The act, under which this petition is filed, is framed with a double aspect, warranting the commencement of a proceeding, to be conducted, either as a public prosecution, as if commenced by the attorney general; or as a suit, in the name of the Commonwealth, at the relation and at the expense of individuals, and with a view to afford them a remedy. The attorney general may intervene at any stage, if the interests of the Commonwealth in his judgment require it. The information therefore should contain all the grounds, on which, were it exclusively a public prosecution, the Commonwealth could demand judgment. We then proceed to the question, whether there be any such violation.

No such condition was contained in the original act. But by Rev. Sts. *c.* 44, § 23, the legislature have a power reserved to alter acts of incorporation, and might prescribe such a condition. The argument of the petitioners is that this was done by *St.* 1851, *c.* 335. That act appears to have been a grant of a special privilege to build their road in sections, a privilege of which they do not appear to have availed themselves. The apparent purpose of the last proviso, that the section nearest Boston should not be built, until the whole capital was subscribed, and twenty per cent. paid, is, to prevent the grant of a right to build in sections, beginning at Dedham, from being converted into a grant to build a local and sectional railroad a short distance out of Boston, and there stop. The proviso seems to be a condition annexed to the privilege of exercising this power, and not intended to make it a condition precedent to the commencement of the whole work, under the original grant.

On the whole matter, the court are of opinion, that no such usurpation of franchise, or violation of charter, on the part of the respondents, has been shown in the present case, as to warrant the filing of this information.

This conclusion renders it unnecessary to express an opinion

Boston and Providence Railroad Corporation *v.* Midland Railroad Company & others.

upon another question, which was considerably argued, and which was this : What private right or interest petitioners must have, to enable them to come in as relators, under the statute of 1852, *c.* 312, §§ 42, 44, and file an information in behalf of the Commonwealth? The learned counsel for the respondents maintained that it must be some right, legal or equitable, recognized by law, and further, that it must be such right or interest, that, in case of diminution or infringement, the petitioner would have some remedy, at law or in equity, and that the purpose of the act was, to afford him a better remedy. We are not prepared to accede to this view of the law; and are not ready to say, that there may not be cases of encroachments on highways, usurpations of maritime privileges, perhaps also usurpations of office, where the redress is properly to be sought by indictment, or other public prosecution, where the injury in legal contemplation is done to the public, but where the actual damage, though alike in kind, may fall more heavily in degree, nay almost exclusively, on an individual, for which however no action would lie, for such individual, in which this statute may have been intended to afford relief. Equitable rights were recognized in this commonwealth, before the statute of 1817, *c.* 87, or any other law, afforded any equitable remedy. But on this point we mean to express no opinion, and make these remarks only to guard against the conclusion, that, by dismissing this petition, we give any sanction to the argument above stated. It is a new statute, no previous adjudication has been had upon it, and we shall consider this question open to the fullest consideration, whenever it may arise. *Petition dismissed*